IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
HARRISONBURG DIVISION

|  |  |  |
|---|---|---|
| MICHELLE WIDNER, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 5:21-cv-00043 |
| | ) | |
| v. | ) | **MEMORANDUM OPINION** |
| | ) | |
| HSV HOLIDAY LLC, *et al.*, | ) | By:     Hon. Thomas T. Cullen |
| | ) |          United States District Judge |
| Defendant. | ) | |

Defendants HSV Holiday LLC ("HSV") and Ugly Duckling Recreation Group Inc. ("Ugly Duckling") (collectively "Defendants") own and operate campgrounds in Broadway, Virginia. Plaintiff Michelle Widner worked at the campgrounds from August 2019 until August 2020. Although both sides agree that her tenure was marred by occasional mistakes, Defendants repeatedly promoted Widner and increased her pay. In June 2020, a campground patron hit Widner with his RV while she was driving a golfcart. She filed a workers' compensation claim for her injuries and began to work remotely. Defendants fired her weeks later.

Widner alleges that the Defendants did so solely because she applied for workers' compensation (which would be unlawful), and she has sued for workers' compensation retaliation. Defendants have moved for summary judgment. (ECF No. 29.) For the reasons discussed below, the court will deny the motion.

## I.     BACKGROUND

Widner worked for Defendants as an at-will employee from August 24, 2019, until August 11, 2020. (Dep. of Michelle Widner at 25:7–8, 48:4–20, 124:1–8, March 11, 2022 [ECF

No. 30-3][1]; *see* Compl. ¶ 6 [ECF No. 1-2].) They quickly promoted her to be campground manager for HSV and Director of Human Resources for Ugly Duckling. (Widner Dep. at 29:13–30:5.) Most frequently, she reported to Scott Eckerson, Ugly Duckling's general manager. (*Id.* at 41:7–20, 49:3–22; Dep. of Scott Eckerson at 17:2–18:2, May 26, 2022 [ECF No. 30-1][2].) Talena Eckerson, Andrea Arnold, and Sandy Arnold also supervised Widner indirectly and occasionally provided her with direction and feedback. (Widner Dep. at 48:21–24; *see also* ECF No. 35-10, at 2.) The Arnolds own the campground. (Widner Dep. at 31:5–32:5.)

Widner's job duties were manifold. She cleaned camp sites and bathrooms, made pizzas to sell as concessions, scheduled shifts, ordered supplies and merchandise, responded to voicemails and emails sent to the company, paid bills, did accounting, posted and filled job openings, and doled out assignments to her team. (*See* Widner Dep. at 27:5–12, 29:5–9, 34:16–35:6, 36:9–23, 39:2–8, 55:15–25, 65:5–22, 72:22–73:2.) Widner executed these tasks well enough that she received four raises and two promotions from Defendants in less than a year. (*See id.* at 25:21–26:2 (explaining that she made about $12 an hour when she started at the campground); *id.* at 28:2–11 (pay raise to $14 an hour); *id.* at 30:6–9 (pay raise to $16 an hour); *id.* at 32:6–11 (pay raise to $36,000 a year); *id.* at 130:12–17 (pay raise to $37,000 a year); ECF No. 35-10, at 32 (same); Widner Dep. at 25:21–25 (explaining that she started as a front desk assistant); *id.* at 29:13–30:5 (promoted to campground manager for HSV); *id.* (promoted to

---

[1] Widner and Defendants submitted different excerpts from Widner's deposition. (*Compare* ECF No. 30-3, *with* ECF No. 35-2.) The court cites these exhibits interchangeably.

[2] Widner and Defendants submitted different excerpts from Eckerson's deposition. (*Compare* ECF No. 30-1, *with* ECF No. 35-1.) The court cites these exhibits interchangeably.

Director of Human Resources for Ugly Duckling).) Her last raise was on June 16, 2020, nine days before her accident. (*See* ECF No. 35-10, at 32.)

None of this is to say that Widner's job performance was perfect. Like most employees, Widner made occasional mistakes. Defendants highlight 10 incidents of "poor performance" in their summary judgment briefing: (1) failing "to complete a campground checklist" requested by Scott Eckerson (Defs.' Br. Supp. Mot. Summ. J. at 4 ¶ 19 [ECF No. 30] ("Opening Br.")); (2) making a mistaken entry in Defendants' QuickBooks accounting program (*id.* ¶ 20); (3) mistakenly offering an inflated hourly wage to a candidate that the company refused to honor after he started, which caused him to quit (*id.* at 4–5 ¶¶ 21–22); (4) posting a job listing for a "General Maintenance Worker" at Defendants' Streetsboro, Ohio campground, but including information relevant to the Broadway, Virginia campground (*id.* at 5 ¶ 25); (5) overlooking an email from a coworker reporting his hours (*id.* at 5 ¶¶ 26–27); (6) overlooking an email from a prospective patron attempting to make a reservation (*id.* at 5–6 ¶¶ 31–32); (7) paying HSV's 2020 mid-year real estate tax bill late (*id.* at 6 ¶ 33); (8) failing to secure documents containing sensitive employee information (*id.* ¶ 37); (9) needing "reminders to complete tasks and answer questions" (*id.* at 5 ¶ 28); and (10) mistakenly informing her supervisor that HSV's bank account balance had fallen to "NEGATIVE $178343.17" (*id.* ¶ 23).

However well (or not well) Widner was doing her job, her employment radically changed on June 25, 2020. A camper, mistaking the gas pedal for the brake, crashed his RV into Widner's golf cart. (Opening Br. at 6; Pl'.s Br. Opp'n Summ. J. at 7 [ECF No. 35] ("Opp'n Br.").) Widner injured her "head, neck, shoulders, arm, breast, hip, and leg," and she

experiences ongoing anxiety and emotional trauma. (Compl. ¶ 16.) She confided in Eckerson that she "was afraid of the medical bills that [she] would be acquiring" because she and her family were uninsured. (Widner Dep. at 147:25–148:5.) Eckerson repeatedly assured Widner that "Defendants wouldn't let that happen," and Defendants continued paying Widner her full salary from the day of her accident until her termination. (*Id.* at 105:10–18, 109:10–18; *see also* Pl.'s Resps. & Objs. Defs.' First Interrogs. at 2–3, 6 [ECF No. 30-5].) Eckerson told Widner that "the most important thing" she could do was to "take care of herself." (Widner Dep. at 108:15–23.)

Nevertheless, Widner retained a lawyer, who filed a workers' compensation claim on her behalf. (Widner Dep. at 147:21–148:19; *see* Pl.'s Resps. & Objs. Defs.' First Interrogs. at 7.) She also sued the driver who injured her. (Widner Dep. at 177:23–178:1.) Eckerson allegedly was "not happy" and "appalled" that Widner had hired counsel. (Pl.'s Resps. & Objs. Defs.' First Interrogs. at 4–6.) Around this time, Defendants first discussed the possibility of terminating Widner. (Eckerson Dep. at 85:21–87:11.) Widner claims that at least four campground employees told her that Eckerson instructed all of the campground employees to stop talking to Widner. (Pl.'s Resps. & Objs. Defs.' First Interrogs. at 5–7.)

While Widner explored ways to recover for her medical expenses, her injuries forced the parties to redefine the terms of her employment. Her doctor recommend that Widner work only 3–4 hours a day. (Widner Dep. at 109:19–110:10.) When she attempted to return to the campgrounds, Defendants insisted that she work from home. (*See id.* at 110:21–111:15.) Defendants monitored Widner's computer usage while she worked remotely. (Eckerson Dep. at 59:7–60:1; ECF No. 30-6, at 3.) When Widner's concussion failed to improve and she

struggled to complete her three- to four-hour shifts, Widner's doctor recommended reducing her hours even further. (Widner Dep. at 114:12–17; ECF No. 30-8, at 2–3.)

Defendants also asked Widner to sign a "Clarification of Job Duties for Modified Return to Work," which defined the parties' expectations for each other while Widner recovered. (*See* ECF No. 35-5.) Duties that required Widner's physical presence at the campground—like manning the front desk and checking in other employees as their shifts started—were reassigned. (*See* Widner Dep. at 34:16–38:16; ECF No. 35-5.) Defendants also proposed that Widner would report to Andrew Frank, who had been her subordinate before the accident. (*See* ECF No. 35-5, at 1.) Widner suggested many amendments to the Defendants' proposed language, and on the advice of her attorney, she ultimately declined to sign the document. (*See* ECF No. 30-7, at 4–5 (showing Widner's markup); Pl.'s Resps. & Objs. Defs.' First Interrogs. at 5 ("[Widner's attorney] instructed her not to sign.").)

After about three and a half weeks under these conditions, Eckerson asked Widner to meet him at the campgrounds. When Widner arrived, Eckerson and Andrea Arnold handed her a termination letter—prepared in part by counsel—and explained that Defendants were firing her for "poor performance and misconduct." (Widner Dep. at 124:2–125:15; ECF No. 30-3, at 89.) The letter explicitly referenced "a lack of security for employees [*sic*] personal and confidential files, performing personal tasks on company time[,] and the restructuring of rates for friends and family." (ECF No. 30-3, at 89.)

In response, Widner sued, alleging that "Defendants terminated [her] employment because she filed a claim for Worker's [*sic*] Compensation," and "[t]here was no other reason for [her] termination." (Compl. ¶¶ 39–40.) In this litigation, Defendants have fleshed out the

aforementioned termination letter's accusations of "misconduct" through six examples: (1) discounting campgrounds for friends and family without a supervisor's approval (Opening Br. at 5 ¶ 29), (2) complaining to Eckerson that "[Andrea Arnold] is up my butt about $2.00" after making an accounting error (*id.* ¶ 30), (3) suggesting edits to Defendants' proposed "Clarification of Job Duties for Modified Return to Work" and refusing to sign the document (*id.* at 7 ¶¶ 46–47), (4) posting personal messages to her Facebook during a remote-work shift (*id.* at 8 ¶ 51), (5) completing a job application for another company during a remote-work shift (*id.* at 8 ¶ 54), and (6) the time theft associated with the Facebook use and job application (*see id.* at 8 ¶¶ 50–52). These six acts, alongside the 10 allegations of "poor performance," are Defendants' 16 proffered reasons for Widner's termination. On this basis, Defendants have moved for summary judgment.

## II.    STANDARD OF REVIEW

Under Rule 56(a), the court must "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Glynn v. EDO Corp.*, 710 F.3d 209, 213 (4th Cir. 2013). When making this determination, the court should consider "the pleadings, depositions, answers to interrogatories, and admissions on file, together with . . . [any] affidavits" filed by the parties. *Celotex*, 477 U.S. at 322. Whether a fact is material depends on the relevant substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* (citation omitted). The moving party bears

the initial burden of demonstrating the absence of a genuine issue of material fact. *Celotex*, 477

U.S. at 323. If the moving party meets that burden, the nonmoving party must then come

forward and establish the specific material facts in dispute to survive summary judgment.

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986).

In determining whether a genuine issue of material fact exists, the court views the facts

and draws all reasonable inferences in the light most favorable to the nonmoving party. *Glynn*,

710 F.3d at 213 (citing *Bonds v. Leavitt*, 629 F.3d 369, 380 (4th Cir. 2011)). Indeed, "[i]t is an

'axiom that in ruling on a motion for summary judgment, the evidence of the nonmovant is

to be believed, and all justifiable inferences are to be drawn in his favor.'" *McAirlaids, Inc. v.*

*Kimberly-Clark Corp.*, 756 F.3d 307, 310 (4th Cir. 2014) (internal alteration omitted) (quoting

*Tolan v. Cotton*, 572 U.S. 650, 651 (2014) (per curiam)). Moreover, "[c]redibility determinations,

the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury

functions, not those of a judge." *Anderson*, 477 U.S. at 255. The nonmoving party must,

however, "set forth specific facts that go beyond the 'mere existence of a scintilla of

evidence.'" *Glynn*, 710 F.3d at 213 (quoting *Anderson*, 477 U.S. at 252). The nonmoving party

must show that "there is sufficient evidence favoring the nonmoving party for a jury to return

a verdict for that party." *Anderson*, 477 U.S. at 249. "In other words, to grant summary

judgment the [c]ourt must determine that no reasonable jury could find for the nonmoving

party on the evidence before it." *Perini Corp. v. Perini Constr., Inc.*, 915 F.2d 121, 124 (4th Cir.

1990) (citing *Anderson*, 477 U.S. at 248). Even when facts are not in dispute, the court cannot

grant summary judgment unless there is "no genuine issue as to the inferences to be drawn

from" those facts. *World-Wide Rights Ltd. P'ship v. Combe, Inc.*, 955 F.2d 242, 244 (4th Cir. 1992).

## III.   ANALYSIS

### A. Widner's Workers' Compensation Retaliation Claim (Va. Code Ann. § 65.2-308(A))

#### i.   Legal Framework

Generally, an at-will employee—like Widner—can be fired at any time without reason. *See Johnston v. William E. Wood & Assocs., Inc.*, 787 S.E.2d 103, 105 (Va. 2016). In a statutory exception to this rule, Virginia law provides that "[n]o employer or person shall discharge an employee solely because the employee intends to file or has filed a [workers' compensation] claim . . . ." Va. Code Ann. § 65.2-308(A). In other words, employers cannot fire at-will employees for filing or intending to file workers' compensation claims.

But employers can terminate employees for proper reasons, even if they know the disciplined employee is preparing a workers' compensation claim. *See Mullins v. Samuel, Son & Co. (USA) Inc.*, 548 F. Supp. 3d 563, 566–67 (W.D. Va. 2021) ("*Mullins*") (employer's decision to terminate employee was at least in part due to "excessive unexcused absences"); *O'Connell v. Isocor Corp.*, 56 F. Supp. 2d 649, 654–55 (E.D. Va. 1999) (employer's decision to terminate employee was at least in part due to company-wide reduction in force).[3]

Although employers have some latitude, Virginia law does not accept the employer's proposed alternative justifications at face value. "An employer's articulated reasons for

---

[3] Two cases suggest that employers may even avoid liability for workers' compensation retaliation if they have an additional *improper* reason for the termination. *See Bailey v. Quest Diagnostics, Inc.*, No. 1:17-cv-625, 2017 WL 6524950, at *11 (E.D. Va. Dec. 12, 2019) (employer's decision to terminate employee was in part due to employee's decision to take FMLA leave); *cf. Warner v. Buck Creek Nursey, Inc.*, 149 F. Supp. 2d 246, 258–60 (W.D. Va. 2001) (denying motion to dismiss worker's compensation retaliation claim despite the presence of ERISA retaliation and wrongful discharge claims in the complaint because Rule 8(e) permits alternative pleading). Widner's complaint does not implicate this issue because it contains only her workers' compensation retaliation claim. (Compl. ¶¶ 33–41.) The court expresses no opinion on the matter.

discharging an employee are merely evidence related to the issue of the employer's motivation, which the jury is entitled to consider along with all the other evidence of the employer's conduct." *Mullins v. Va. Lutheran Homes, Inc.*, 479 S.E.2d 530, 533 (Va. 1997) (Keenan, J.) ("*Va. Lutheran*"). A plaintiff can prove her employer's reason for discharging her by circumstantial evidence. *Id.* When the employer has offered a legitimate, non-retaliatory reason for the discipline, and the employee has offered evidence that the discipline is "solely" related to her workers' compensation claim, a jury must decide between the competing narratives.

Consider two examples. The plaintiff in *Va. Lutheran*, a nursing home employee, injured her left hand when she broke a resident's fall. *Id.* at 532. One doctor splinted her hand, and another told her that she could only complete "light-duty work" until she recovered. *Id.* The plaintiff's employer told her that there were no positions that required only light-duty work available, and she filed for workers' compensation. *Id.* The nursing home terminated her once "her 'sick' leave had expired and she was unable to return to work." *Id.* But the court held that this proffered alternative reason was insufficient to warrant summary judgment to the defendant. A witness testified that the plaintiff's manager had told the plaintiff that "she was being discharged due to her job-related injury," and there was evidence that two of plaintiff's managers had suggested "that avoiding employee injury claims was more important than providing for the safety of [the nursing home's] residents." *Id.* at 533. This was enough to have a jury decide whether the employer terminated the plaintiff "solely" because of her workers' compensation claim. *See id.*

In *Charlton v. Craddock-Terry Shoe Corp.*, 369 S.E.2d 175 (Va. 1988), the Supreme Court of Virginia reversed a lower court's decision to set aside a jury verdict for the plaintiff and

enter judgment for the defendant. *Id.* at 175–76, 178. Despite the plaintiff's own testimony that she was terminated for her initial refusal to sign a waiver (i.e., not for filing her workers' compensation claim), the court held that other evidence was enough to support the jury's verdict. *Id.* at 176–77. Specifically, the defendant had waited to fire the plaintiff until after she signed the waiver. *Id.* at 177–78. The court reinstated the jury's verdict for the plaintiff because the "uncontradicted" record undermined the defendant's proffered reason for her termination. *Id.*

The Supreme Court of Virginia has added one wrinkle to this principle. An employee cannot sustain a workers' compensation retaliation claim based only on the retaliation's closeness in time to the injury. *See Jordan v. Clay's Rest Home, Inc.*, 483 S.E.2d 203, 207 (Va. 1997); *see also O'Connell*, 56 F. Supp. 2d at 655 (citing *Jordan* and granting summary judgment in part because the "[p]laintiff has no evidence of statements about her accident"); *Taylor v. Wal-Mart Stores, Inc.*, 376 F. Supp. 2d 653, 664 (E.D. Va. 2005) (similar). This rule neatly addresses a policy argument that Defendants raised at the hearing on this motion. It is not true that employers cannot fire employees who suffer injuries. If an employee sues to challenge that decision, she must provide evidence that the challenged action was taken "solely" because of her workers' compensation claim.

To survive summary judgment, then, a plaintiff must either supplement her claim with evidence suggesting that her employer fired her for her workers' compensation claim (like in *Va. Lutheran*) or undermine her employer's proffered reasons for disciplining her (like in *Charlton*). Widner has done both.

### ii.    Widner's Circumstantial Evidence

Here, Defendants justify Widner's termination based on 16 identified instances of "poor performance and misconduct." But 10 of these instances predated Widner's fourth raise and happened concurrently with two promotions and three other pay raises.[4] This timing undercuts Defendants' argument that Widner was performing so poorly as to justify her termination. *Cf. Charlton*, 369 S.E.3d at 177–78. There are, however, two instances of "poor performance" that came after the accident: failing to secure sensitive employee documents and posting the Virginia campground information in the Ohio job listing.

Widner's injuries occurred on June 25, 2020. (Opening Br. at 6; Opp'n Br. at 14.) Eckerson discovered the unsecured employee information the next day when he opened up the camp. (Eckerson Dep. at 72:2–73:13.) Nevertheless, after learning of this mistake, Defendants continued to pay Widner's full salary and proposed amended job responsibilities so she could work from home. (*See* ECF No. 35-5, at 1.) These actions suggest that, at least as of July 6, 2020, when they offered her the amended working conditions, Defendants did not

---

[4] Widner's last raise was on June 16, 2020. (*See* ECF No. 35-10, at 32.) At the time, 10 of Defendants' proffered reasons for firing Widner had either already happened or were ongoing. (*See* Eckerson Dep. at 69:6–70:13 (explaining that he had asked Widner to prepare either a checklist of opening procedures, closing procedures, or housekeeping procedures, which Widner never did); ECF No. 30-3, at 64, 66 (text messages between Eckerson and Widner dated on or around June 8, 2022, discussing the proper use of Quickbooks accounting software); *id.* at 68–69 (text message dated earlier than March 28, 2020, in which Widner offers a job candidate more than she was supposed to, and email between Widner and another employee speculating that that candidate later quit because Defendants did not honor the rate Widner had offered); *id.* at 74 (text message dated March 25, 2020 in which Eckerson explains to Widner that she missed an employee's email containing his time for an earlier pay period); *id.* at 75–78 (email chain dated on or before May 18, 2020, in which a camper repeatedly tries (and fails) to get an employee to respond); *id.* at 79 (undated text messages between Widner and Eckerson about a bill due on June 5, 2020, which had not been timely paid); *id.* at 80 (Widner mistakenly reports to Eckerson and Andrea Arnold that an account balance was "NEGATIVE $178343.17" in April 2020); *id.* at 81 (text messages dated May 4, 2020, in which Widner complained to Eckerson that Andrea Arnold was "up my butt about $2.00"); Widner Dep. at 76:12–15 (Widner agrees that she "probably" needed "to be reminded to complete tasks" and "answer questions" while employed by Defendants); *id.* at 146:24–147:14 (Widner explains that she sometimes discounted campgrounds for family and friends without a supervisor's permission).)

view Widner's failure to secure sensitive employee documents as serious enough to warrant termination.

That leaves the incorrect job description. On or around August 6, 2020, Widner posted a job listing for Defendants' Streetsboro, Ohio, campground, but included in it information about the Broadway, Virginia, campground. (ECF No. 30-3, at 73.) This came more than a month after Defendants offered her amended working conditions, and only about one week before she was terminated. It is the only example of "poor performance" after which the company did not either increase Widner's pay or try to amend her employment terms.

Four instances of purported "misconduct" also occurred after Widner's accident. Three of these are interrelated. While working remotely, Widner posted personal messages on her personal social media accounts and applied for another job.[5] (ECF No. 30-3, at 85–88; *id.* at 90.) Defendants uncovered this misconduct by subjecting Widner to unique surveillance. Once Widner started working from home, Defendants began monitoring her online activity. (ECF No. 30-6, at 3; Eckerson Dep. at 59:7–60:15.) There is no evidence in the summary judgment record that any other employee was subject to similar surveillance. To the contrary, Defendants never disciplined any other employee for social media activity during work hours. (Eckerson Dep. at 65:13–67:15; 68:14–69:4.) Nor is there any evidence that Defendants surveilled Widner's online activity while she was working at the campground before her accident, even though she often worked from a computer. (Widner Dep. at 34:16–35:6; Eckerson Dep. at 39:5–40:5; *see also* ECF No. 35-10 (emails sent and received by Widner).)

---

[5] Defendants combine these two instances to come up with a third post-accident episode of misconduct: time theft. (Opening Br. at 8 ¶¶ 50–51.)

The fourth claimed act of misconduct is Widner's refusal to sign Defendants' "Clarification of Job Duties for Modified Return to Work." (Pl.'s Resps. & Objs. Defs.' First Interrogs. at 5; *see* Opening Br. at 7 ¶ 47.) Of course, despite this refusal, Defendants started Widner on an abridged remote-work schedule, which the parties kept for almost a month.

In sum, Defendants' willingness to work with Widner for almost a month despite her refusal to sign the "Clarification of Job Duties for Modified Return to Work" suggests that they did not consider this a terminable offense. And their three other identified instances of misconduct are undermined by the fact that they undertook unique surveillance measures to uncover them, which could suggest to a reasonable jury that Defendants sought out pretextual grounds to justify firing Widner.

### iii.     Widner's Direct Evidence

Widner has also introduced direct evidence that Defendants fired her for filing her workers' compensation claim. Just nine days before her accident, Defendants gave Widner a raise. (*See* ECF No. 35-10, at 32.) After her accident, Eckerson told her that "she didn't need to worry about" filing for workers' compensation. (Pl.'s Resps. & Objs. Defs.' First Interrogs. at 3.) He further testified that Defendants only began to consider terminating Widner after her accident when they drafted her amended work obligations. (Eckerson Dep. at 85:21–87:11.) Around this same time, though, Widner says that Eckerson had told the other employees to stop speaking with her. (*See* Pl.'s Resps. & Objs. Defs.' First Interrogs. at 5–6.) And she also remembers Eckerson being upset that she had hired an attorney to help with her workers' compensation claim. (*See id.* at 6.)

Eckerson's uncontroverted testimony on this point is that Defendants began to consider terminating Widner at some time between June 25, 2020 (her accident) and July 20, 2020 (her return to remote work). This range is after Defendants had given Widner her final raise. (ECF No. 35-10, at 32.) And it comes *before* Widner's personal social media posts (July 22, 2020), Widner's incorrect job posting (August 6, 2020), and Widner's job application (August 6, 2020). The only key events that fall within this period include Widner's filing of her workers' compensation claim (July 2, 2020) and Eckerson discovering the unsecured employment documents (June 26, 2020).

Eckerson's suggestion to Widner that she not file a workers' compensation claim, Eckeson's alleged request to other employees to give Widner the cold shoulder, and Eckerson's testimony that Defendants had not considered firing Widner until after she filed her workers' compensation claim present a genuine issue of material fact as to the reason why she was terminated.[6]

To be sure, an employee cannot sustain a workers' compensation retaliation claim based only on the termination's close timing with the injury. *See Jordan*, 483 S.E.2d at 207. This is not the case here. Defendants' agents "were not happy" that Widner had retained an attorney to file for workers' compensation, Widner testified that these agents told the other employees

---

[6] At the hearing on this motion, Defendants leaned heavily on the argument that they would be entitled to summary judgment if Widner failed to rebut even one of their 16 justifications for her termination. And here, Widner posted Virginia campground information in an Ohio job listing on or around August 7, 2022. (*See* ECF No. 35-10, at 41; ECF No. 30-3, at 72.) Defendants never ratified this mistake by giving Widner a raise or welcoming her back on a remote-work schedule, and Defendants did not undertake extraordinary surveillance to discover this mistake.

But Defendants are wrong that this failure entitles them to summary judgment. *See Va. Lutheran*, 479 S.E.2d at 533 (denying summary judgment to employer despite two unrefuted justifications for why it terminated the plaintiff's employment). "Viewed in the light most favorable to [Widner], [her] evidence is sufficient to raise a question of fact whether [Widner] was discharged solely for filing a workers' compensation claim." *Id.*

to stop communicating with her, and Eckerson agreed that Defendants did not consider terminating Widner's employment or monitoring her computer activity until after her accident. (*See* Pl.'s Resps. & Objs. Defs.' First Interrogs. at 4–6; Eckerson Dep. at 85:21–87:11.)

### iv.    Application

On the basis of this record, and drawing all inferences in Widner's favor, a reasonable jury could conclude that Defendants did not think the "poor performance and misconduct" that predated Widner's accident warranted termination; that Defendants began discussing Widner's termination only after they learned she was planning to file a workers' compensation claim; that Defendants encouraged Widner not to file a workers' compensation claim; that Defendants instructed their other employees to stop talking to Widner after she filed her workers' compensation claim; that Defendants singled-out Widner's computer activity for electronic surveillance only after they began discussing her possible termination; that information learned through that surveillance was part of their stated reasons for firing Widner; and that all of the Defendants' stated reasons for terminating Widner were pretextual.

None of this is to say that these reasons are not the real reasons Defendants fired Widner, or that a jury could not find Defendants' presentation convincing—just that Defendants are not entitled to summary judgment. Widner has uncovered direct and circumstantial evidence that she was fired "solely" for her workers' compensation retaliation claim, and she is entitled to present that claim to a jury. *See Va. Lutheran*, 479 S.E.2d at 533; *cf. Charlton*, 369 S.E.3d at 177–78.

## B.  Ugly Duckling's Capacity to be Sued

The second issue is whether Ugly Duckling is properly a named defendant in this litigation. Widner argues that Ugly Duckling was her "employer," for purposes of Virginia's workers' compensation statute. She was listed as the company's Director of Human Resources on its website and in her email signature. (Widner Dep. at 30:10-15; ECF No. 35-10, at 21.) And Defendants included references to Ugly Duckling on the Clarification of Job Duties they shared with Widner, in Widner's termination letter, and in her severance agreement. (*See* ECF No. 35-3, at 1; ECF No. 35-6, at 1; ECF No. 35-7, at 1.)

Defendants counter that Ugly Duckling was simply a trade name that HSV used to market itself. Until it was formally incorporated in January 2021—six months after Widner's termination—Ugly Duckling did not technically exist. (Opening Br. at 17 ("[Ugly Duckling] is entitled to summary judgment because it did not exist while Plaintiff worked for HSV[.]"); Defs.' Reply Br. Supp. Mot. Summ. J. at 9 ("[Ugly Duckling] did not exist as a separate legal entity until *after* Plaintiff's employment was terminated."); *id.* at 9–10 ("[Ugly Duckling] did not become a separate legal entity until January 1, 2021, five months after Plaintiff's termination.").) And trade names are not "separate legal enti[ies] capable of being sued." *Snowden v. CheckPoint Check Cashing*, 290 F.3d 631, 634 n.2 (4th Cir. 2002) (collecting cases). So, Defendants argue, Widner has named a defendant that did not exist at the relevant time, and that defendant is therefore entitled to summary judgment.

This argument is belied by the record. According to corporate filings referenced (but not included) in Defendants' briefing, a then-16-year-old company formally changed its name in 2021 to become "Ugly Duckling Recreation Group Inc." (*See* ECF No. 30-2, at 7–8.) Before

this rebranding, that company went by "Zebedee Services, Inc." ("Zebedee").[7] According to Zebedee's 2019, 2018, and 2017 filings, it had the same principal place of business as Ugly Duckling does now, the same mailing address as Ugly Duckling does now, and the same two owners as Ugly Duckling does now. In sum, Ugly Duckling is not a trade name—it is the newest name of a corporation that existed during Widner's employment, and it is a proper defendant.

Corporations cannot shed legal liabilities by simply changing their names. Ugly Duckling's alternative argument for summary judgment—that it did not exist at the time of Widner's employment—is demonstrably false. Accordingly, summary judgment to Ugly Duckling on the basis of this argument is denied.

## IV.   CONCLUSION

For the reasons discussed above, Defendants' motion for summary judgment (ECF No. 29) will be denied.

The clerk is directed to forward a copy of this Memorandum Opinion and the accompanying Order to all counsel of record.

**ENTERED** this 11th day of August, 2022.

*/s/ Thomas T. Cullen*
HON. THOMAS T. CULLEN
UNITED STATES DISTRICT JUDGE

---

[7] Under Federal Rule of Evidence 201, the court can take judicial notice of filings made with the Florida Secretary of State. *See, e.g., Gaboratory, Inc. v. Gaboratory Int'l, Inc.*, No. CV 07-04725, 2008 WL 11406072, at *7 n.29 (C.D. Cal. Nov. 10, 2008) (collecting cases); *Bank of Am., N.A. v. Teryl Emery DDS, LLC*, No. 15-CV-00778, 2016 WL 4086776, at *1 n.2 (M.D. La. July 28, 2016) (considering judicially noticed corporate filings on summary judgment).